Good morning. May it please the Court. My name is Curtis Pierce. I'm the attorney for the petitioner, Dave Vo. The petitioner is a national from Vietnam. He obtained his lawful permanent residency status in 1980. As I'm sure the Court is aware, in 1983, he was convicted of a very serious, shocking crime, attempted murder. He was sentenced to 12 years in state prison, served 6 years. After that time, he applied to become an American citizen, and I think that's what brought this case to the attention of the United States government. Removal proceedings were initiated in 1998. Before the immigration judge, he applied for two forms of relief, discretionary relief under 212C as well as relief pursuant to the Convention Against Torture, deferral of removal. Both forms of relief were denied. So I've argued on appeal that the judge erred in his decision, and I also erred that this Court has jurisdiction to the 212C because he misapplied the law. This week, I sent supplemental authorities to the U.S. government citing the case of Ledesma. Ledesma, Galicia v. Holder, 599 F. 3rd, 1055. This case came out in 2010, two years after the briefs were submitted, and it occurred to me that this is relevant to this case because it held that the 1988 law for aggravated felony convictions, which was enacted November 18, 1988, does not apply to convictions prior to that date. Therefore, if my client were in proceedings today, he would not be deemed to have committed an aggravated felony, and this is relevant for one of the forms of relief for which he wished to apply. That was cancellation of removal of the law for permanent residence, and his application is on page 530 of the administrative record. And it's funny, Your Honor, I used to invest in mediation in the other case because I did speak with the counsel Monday or Tuesday this week, and I was thinking this case could be remanded to give the petitioner an opportunity to apply for cancellation of removal for lawful permanent residence based on this fairly recent holding, Ledesma, Galicia v. Holder. I don't want to speak for opposing counsel, but I believe the government's position is that they're not inclined to agree to a remand. Is that based on the fact that the nature of the crime, shooting the two people? Is that why it's an aggravated felony? No, is that why they don't want to go? Oh, I can't speak. I would assume that because it's a serious crime, I have to, again, let Ms. Kerlin give us the exact reason. Now, a couple points here. This crime is very old. It's nearly 30 years old, as Your Honor pointed out in the last case, which is something I want this Court to be mindful of. Again, as I mentioned, it's an inexcusable, extremely serious, shocking crime, but this was a one-time incident. This is a petitioner that's not a criminal. Other than this incident, he's led an exemplary life. Well, do we have jurisdiction over the errors committed by the IJ rise to the level of a constitutional violation of due process? Clearly, we have jurisdiction. This Court has jurisdiction over the claim for relief under the Torture Convention, Article 3 of the Convention on Torture. For the 212C, I'm arguing that you do, because we argue the judge misapplied the law. Under the Real ID Act, if there's a misapplication of the law to the facts, there's jurisdiction. Now, with regard to that, Your Honor, the administrative precedent holds that the immigration judge may not require rehabilitation or reformation as an absolute prerequisite to granting discretionary relief. That's the case in the matter of Edwards that's cited in the briefs. Do you think that's what the judge was doing? Wait. Your Honor, on the surface, he wasn't doing that. He seemed to have balanced the equities. He mentioned a few, but here on page – this is administrative record, page 75. In his conclusion, he stated, and I quote, The Court finds that there is a lack of evidence that Respondent has genuinely rehabilitated and that Respondent has failed to prove that he entitled to a favorable exercise of discretion under 212C. And I quoted verbatim a couple of errors there. Now, that was his conclusion. He focused on rehabilitation. And another point I wanted to make was that he mentioned that the petitioner failed to reach out to the victim. He seemed to suggest that to show rehabilitation, the petitioner must have apologized directly to the victim and reached out to her. And he doesn't cite any – yes? The judge seemed to think that he wasn't really taking responsibility for his crime and that he tried to downplay it. Here we have a situation where he has blinded the woman and the crime's taken place in front of their small child. Yes. And so he's just saying this guy's not taking responsibility for what he did. Okay. Yes, Your Honor. If I can address that in a moment, I wanted to finish that last point about the rehabilitation. He seems to suggest that reaching out to the victim is a requirement for rehabilitation, but there's no administrative precedent to support that point. With regard to Your Honor's question, now I'd like to address that. Yes, the immigration judge did state that, but that's not supported by the administrative record. The judge states he doesn't express remorse. He only expressed remorse to his family. But there are many sections in the administrative record where he is expressing remorse. And I have them here. Page AR, administrative record, page 147. The petitioner deeply expresses remorse. So I want to say that I've had my law clerk do a chart. Yes. And, in fact, I would agree with you that the IJ in numerous places mischaracterizes the actual record. Numerous. That he says he's not expressed remorse, and Beau, in fact, testifies that I am very remorseful. There's just countless ways in which the IJ completely mischaracterizes the transcripts of the testimony and the actual facts given. Yes. Under the standard of review, how do we get to review that? It has to be either a violation of law or a constitutional violation. Right. Well, again, he misapplied the law to the facts. If this court finds that he did hold that rehabilitation was a prerequisite, that's one way. That would confer jurisdiction. If the court finds, and that was my earlier point, that he invented a requirement for an applicant to establish rehabilitation, he must reach out to the victim. I think that would be another way. I don't think the victim would necessarily want to see him. Your Honor, that's the point I wanted to make. I discussed this with colleagues that don't say that. Yes, I completely agree. He would be the last person I'd want to see if I were the victim. Absolutely. And, plus, I mean, the circumstances of that particular crime. I mean, he had been the one of the victims had been living with him and left her husband, and the other was the cuckolded husband. So I don't see how they want to go back and relive this portion of their lives either. I completely agree. I think sometimes in these cases, while we're going down this road, the immigration judge has a case to adjudicate. He sees a shocking crime like this. He says, look, this is terrible. Someone was blinded. I'm not granting this. And then they have to look for reasons. I'm not saying that's exactly what happened here. Well, I'm very, very troubled by the inconsistencies between the IJ's so-called factual findings and the actual transcripts and the actual record. And my question is, how does that give us review? I mean, is it application of law? Or does it rise to the level of constitutional due process violation? Well, if the judge is stating facts in the record that are not supported by the record, I think it's a strong argument in the event that that violates the petitioner's right to due process. I guess, I mean, I don't know. We haven't been able to find any particular cases on point. But it would seem as though if you have a whole record that is contrary to what the IJ says are his findings, that that's not really justice. I mean, I haven't found any cases I've not seen any that's this egregious.  I would agree, Your Honor. And I would urge the Court to assert jurisdiction in a transcript like this, if the judge's decision, if his statement of facts is not consistent with what the administrative record shows, was stated during the hearing. Now, on your point about the legal error with respect to the rehabilitation, you quote that one sentence, but the beginning of the same paragraph starts by identifying a number of factors. Right. The seriousness of the felony, lack of remorse, failure to assist. It's not just the... Right. I mentioned that earlier, Your Honor. That's true. He does purport to balance equities. But he does conclude when I, the sentence I quoted was his conclusion. Right. He just focuses on the rehabilitation and also seems to have another requirement to it, that the applicant's petition must have reached out to the victim, which seems to be, again, a strange requirement here. It would be a strange requirement. It's a little strained to find that in that paragraph, but I take your point. All right. Thank you, Counsel. You're over your time. I know you didn't reach the deferral issue, but you've adequately briefed it. It's not waived because you didn't talk about it. Okay. Thank you. May it please the Court, I represent the United States Attorney General, who is the respondent in this case. Pursuant to 242A2B2, this Court lacks jurisdiction to review the agency's discretionary denial of petitioner's application for a 212C waiver because he hasn't raised a constitutional claim or a question of law. You mentioned that you were concerned about various what seemed to be mischaracterizations of the facts, but according to the petitioner's testimony, and in light of the sentencing report and the criminal report that was in the record, petitioner, the immigration judge took into account in his decision, he discussed the various positive factors and because petitioner had raised, had asserted that rehabilitation was a positive factor, he had pointed to various things that showed that he had rehabilitated, the I.J. took that into consideration, which was it was within his discretion and his authority to balance those factors, and although he may have come to a decision that the Court may not agree with, at the same time, that he was still. No, I think there's misstatements at the record. I'll just give you one example on remorse. Here's what the I.J. said. Respondent neither shows remorse for any physical and emotional injuries he has caused upon the victims and their daughter, nor does he show any compassion for them. Both stated, and by the way, this transcript was clearly being transcribed through an interpreter, and there were a lot of problems in reading the transcript. I'm sure you've read it, too, where they couldn't understand what was being said. I'm just noting that. But what he did say was, I feel remorseful, regretting because of hot temper I could control. I feel real bad. Would I admit I did before with my education like that? I don't think I would such thing. I feel very bad. Bo's wife testified he told her he felt bad about what he did. Khan, his son, testified that in everything Bo does, he is making amends, and that you can tell he's very sorry. Nguyen, a friend of his, testified that Bo cried and showed a great deal of remorse in prison, and he volunteers to assist disadvantaged members in the community. I mean, he did show remorse. How can you characterize all of this as not showing remorse? Well, Your Honor, first of all, he did not. He testified in English. So I think that some of the parts that didn't come through in certain words and things were because of probably the volume or, I would guess. And second of all, he, the IJ, he stated in his testimony that he was remorseful, yet upon, when he was questioned by the government attorney, it was, he clarified that his, it seemed to the IJ that his remorse related to what the consequences and what it did to his family when his wife and children came, he was still in prison. And it seemed that his expression of that remorse was related to that. In addition, when his wife said that he seemed remorseful, yet he never told her when she was asked upon further questioning what she knew about the circumstances, it seemed to be that he, as he told it to her, that it somehow was the woman's fault because he simply stated that the victim, it was because the victim owed me money, and she was not very clear about the circumstances of the crime or what happened. She just, you know, and it seemed the same thing with his sons, that they had no idea sort of what has happened, that it seemed that Petitioner had not been forthcoming, which is what the immigration judge discussed as part of his weighing of the factors. Again, he took, it was within his authority and his discretion to consider the Petitioner's testimony, but also to consider it in light of what the witnesses said in light of the cold-blooded, brutal nature of the crime, and how 22 years later, as an individual who has been working all that time in social services, to say when questioned about, you know, whether did he, was he at all concerned about the implications of his crime to the victim's three-year-old child, he had stated that she probably, you know, was too young to appreciate that, when in fact, according to the report, the paramedics, when they arrived at the scene, found her soaked in her parents' blood. So that's just an example of how the immigration judge took into consideration all of this evidence and merely weighed it and exercised his discretion. Again, Petitioner has not identified a constitutional provision, a statute, or regulation that the agency violated. It was, it is clear from the immigration judge's decision that he considered all of the factors that were permissible to him, according to the case law, and merely gave, put more emphasis to certain factors that he felt weighed against the Petitioner. And those factors, to him, in his discretion, meant that this Petitioner was not eligible for this form of relief, because he, in the end, should not be allowed to retain his legal privileges. You agree, I assume, that if an immigration judge simply put in a load of facts that had no basis at all in the record anywhere, or essentially, best you could tell, made up, that that would be a violation of due process? It would be a violation of due process if, for instance, the immigration judge could not have completely showed some sort of bias. In that case, that would be, like, for instance, if he said something like, I do not Not that he said anything, but just that the facts listed in the opinion were Had no basis. Nowhere. Yes, Your Honor. Okay. So the question then becomes a line-drawing one. Well, again to pick up on Judge Wardlaw's questions, why this case, taking her question, why this case doesn't cross that line as well? Well, this case doesn't cross that line because there was evidence, and the immigration judge did discuss the testimony. He did show that he took into consideration the positive factors as well as the negative factors. And he, in his discretion, according to his decision, although he may have placed more weight on certain answers that the Respondent gave upon cross-examination rather than upon actual testimony or made inferences from that testimony and the record, that was within his discretion. And it wasn't It did not in this case show that he has violated any sort of constitutional right or statute or regulation. It just simply has not It hasn't been shown that he didn't weigh the factors. And even if he came to a conclusion that is different from a reviewing court, that is still within his discretion to do. Can I ask you a question about the torture claim, which these kinds of claims are, of course, notoriously difficult because of the trying to predict something that's unpredictable. And why isn't the fact that there was prior torture pretty strong indication that there's a risk of future torture? Well, the fact is it's been 30 years since Petitioner left Vietnam. And in looking at deferral of removal under PAC. What's the significance of that, that people have forgotten? No. Well, it's been 30 years. And since that time, between 1993 to 2002, Petitioner made, as the immigration judge observed, made four trips back to Vietnam as a Vietnamese citizen. And he suffered no harm or whatsoever from the authorities. So it was reasonable for the judge to take that into consideration, take into also the consideration the fact that the circumstances that existed in the country 30 years ago following a war are not the same as the circumstances that exist now. And the deferral of eligibility for deferral of removal, it looks at the likelihood of torture in the future, not necessarily what's happened in the past. And that's probably the best indicators what has happened in the past. Not necessarily when we're looking at a situation in a country like Vietnam, where 30 years, you know, the country has changed significantly to the point where an individual like Petitioner, who is claiming that he fears torture, has not shown that by his actions of returning to his country. What if he had never returned? What do you think then? That might be for the agency in its decision to say that that may be an indicator of the fact that it may be more, it may have helped his case more in that case. But again, you know, torture, past torture is relevant, but it is only another factor to be considered in determining the likelihood of future torture. In other words, it is not explicitly stated as a presumption that the agency must abide by. I have another question. Where in the IG's decision does it show that he took into account the 15 letters of support from people like the mayor of the city of Westminster and the Vietnamese-American community and letters from Maximus Huffington? There were 15 letters plus a certificate from the Buddhist organization that all attested to his rehabilitation for participation in the community. Where did the IG take that into account at all? I believe at the beginning of the immigration judge's decision during his discussion of the evidence that he, I believe he cited Petitioner. He discussed that Petitioner was a practicing Buddhist, that he stated that he helps out in his community, that he submitted documents in support of his... But did he take them into consideration at all when he made all these findings that there's no rehabilitation and... When he stated that the positive factors in the case, he talked about the Petitioner's long-term residency. He discussed those things. He didn't say exhaustively everything, but to him, again, in his discretion, the negative factors in the case were more prominent. This decision to me just seems like the most arbitrary one I've seen. I'm curious, both these cases, this one and the last one we've looked at, the IJ decision was in 2003. Here we are in 2011 considering this decision. What has suddenly brought these cases to the forefront where they're being pursued at this point to the appeal? Does the appeal from 2003 case ordinarily take eight years? The appeal from the two... You were in both cases, right? Yes. Is there some special group within the Department of Justice that's taking up cases where there's old murders or something? I mean, it seems to me, both these people, they committed... One a murder, one a shooting, and then four years in this country, and now all of a sudden the Department of Justice is trying to get them deported based on that? And both of these people seem to have done, you know, there's no subsequent criminal history. There's nothing else that's brought them to the attention of the authorities. Really, I'm just trying to have an understanding of the context in which this is being raised to us. Well, the context in which this claim, this particular case is being raised is because there were various appeals, because the initial immigration judge order was actually to terminate the case because the petitioner had attempted to apply for naturalization. And so when the government appealed, that brought the case, and the board remanded the case back to the immigration judge, that brought the case back into the removal proceeding. So that was partly the reason for why it's the process has taken that long. With regards to the first case... How old is Mr. Bo at this point? How old is Mr. Bo? He's 68. So here we are talking about two people with unblemished records for 40 years, 168, 172, and you want to send them back to Vietnam, the Philippines. All right. I accept your argument. I think you've made every argument and support you can. And you're over your time. Okay. Thank you. Okay. Just one minute. With regards to trips to Vietnam, Your Honor, they're on the administrative record page 571 and 99. He had three trips, not four. Very short trips. He stayed in the countryside. This was for family and medical reasons. Thank you very much. All right. We'll take up U.S. v. Rodriguez-Netford and Vogue v. Holder is submitted. Okay. Good morning, Your Honors. Devin Burstein, Federal Defenders of San Diego for Mr. Rodriguez-Netford's. I'm going to endeavor to watch the clock and save two minutes for rebuttal. In the first case, Judge Fletcher said to my colleague, or actually to the government in addressing one of my colleague's arguments, that we want to know that the district court understood and knew its options. It knew what it could do. And I think that is very, very true in this case. In the course of preparing, I've come to at least my thought that really this case can be largely decided within the confines of this court's en banc decision in Hinkson. And as that was fleshed out, or at least the rationale was fleshed out in Mancinas Flores. And in Hinkson, this court en banc took great, went to great lengths to explain the abuse of discretion statement. And it said, the first step of our abuse of discretion test is to determine de novo whether the district court identified the correct legal rule to apply the relief requested. If the trial court failed to do so, we must conclude it abused its discretion. And that's not some hollow statement. It's not we want them to check off a list that has no meaning, so we're making sure that, you know, they're tying their shoes right. It has real and important implications, and I think those come and are illustrated perhaps best by Mancinas Flores, where the court is discussing, when we review for abuse of discretion, we necessarily review the district court's decision-making process, not simply whether the decision resulted in a permissible outcome. And there's all types of language in Mancinas Flores about really the problem when the district court has a discretionary decision, but doesn't explain. And that's especially true here, where we have what is really a novel issue about the ability to withdraw from waivers to supervise release admissions. Here, there is no case law setting forth exactly the right standard. So it was imperative, in order for you to be able to review it meaningfully, for the district court to give some kind of explication, okay, you know, I find this standard applicable. I'm exercising my discretion in denying it. These are the factors I've considered. I understand this is new case law. There's nothing here. There's nothing upon which this court can say, yeah, that's the standard the district court applied, and we agree or disagree. And therein, without anything further, lies an abuse of discretion that would require a remand. So I think the question is not whether the district court abuses discretion as a legal matter, so much as it is, okay, well, what's the remedy? What is the remand for? Let's suppose I agree with you, we agree with you on your basic point that there wasn't the identification of a standard. Then there are multiple options I think you're getting to this. One is just to remand, say nothing more than that. Another is to remand and to say what the proper standard is for admissions, withdrawal, fair and just or something else. A third option is to say, for example, fair and just standard and to flesh out what that means. What are you asking for? That's exactly where I was going, Your Honor. I would be asking for actually a fourth option, which would be the district court abuses discretion by failing to identify and apply the correct legal standard. The correct legal standard is the fair and just standard because it's the most closely analogous. Here, the district court under any, under that standard simply, or no, excuse me, here, Mr. Rodriguez clearly met the fair and just standard. So we are remanding, reversing and remanding as this court did in Ortega Anciano with the direction that the, that Mr. Rodriguez be allowed to withdraw from his violation admissions and proceed with his due process hearing rights under Rule 32.1. Let me ask procedurally, has he served an additional year incarceration? He is in the process. He caused his District of Arizona conviction. He was already serving the custody time for that when he was brought over to San Diego for his violation petition. Those will run consecutively and assuming no glitches in the Department of, the Bureau of Prisons, and I can't speak to them, but assuming no glitches, he should not be moved or it should just run. And he's scheduled for release near the end of this year. But it hasn't run yet on this case. No, no. It is not mooted out by him. It would be anyway, but it hasn't run, right? It hasn't run. I'm not even sure that it's started. It may have started. I don't want to put my foot in my mouth because I don't know the exact answer, but it certainly hasn't run. So do you believe that he has, that the district court had authority pursuant to the, his inherent authority to engage in the fair administration of justice to allow Rodriguez to be released? Withdraw his admissions. Is that your position? Yes, that's in part our position. So rule 32.1 says, you know, you have these hearing rights, these due process hearing rights, unless waived. So if you can take a waiver, you must be allowed to withdraw it. And we would point to cases like Hastings. Well, I guess I'm going to, as the standard again, if the statute that gives the district court authority is one that says he has this fair administration of justice, I'm wondering if inherent in that isn't both the sense of fairness and a sense of justice, which is actually the rule 11 standard without necessarily incorporating the rule 11 standard. Right. And I think that's a good point. And I think it really, it stretches back to, I believe it's, what's it, Kirchhoff. It's the 1927 Supreme Court case that first enunciates that. And it's Justice Brandeis, Justice Holmes are on it. And basically it's looking back to all these 1880s cases from state Supreme Courts and it's saying, and it says it's, you know, one of those short old Supreme Court cases. And it says, you know, you should have the. Short and to the point. So long. That's right. And then you can believe there was not even a dissent. Not ignore. There was a one line concurrence. It's 1927 and they said you should be granted that privilege for any reason. For any reason, it appears fair and just. And how can we argue with an idea of fair and just? Okay. So in this case, I mean, you're not arguing that a person who admits to certain allegations in a supervised release revocation context has all the rights attendant to rule 32 guilty. Please. You're saying, however, in this case, given that everybody told him he was going to have six months and then all of a sudden, and no one told him that the judge didn't have to follow that recommendation, which would be the case in an ordinary plea colloquy, you're saying given this particular fact situation, it was unfair to hold them to it. That's exactly my argument. It's just I'm not saying. I cannot stress enough. This law, the case law is clear. The government's pointed it out and tried to attribute it to me. I'm not saying that rule 11 colloquy requirements applying supervised release, that would be disingenuous and it would be an error as a matter of law. Are you saying, though, that the judge must warn the defendant of the maximum sentence? Not necessarily in every case. I see that I want to answer your question. Answer the question, please. Not in every case. But here, this case is very important. It was set for a contested hearing. Mr. Rodriguez was not going to admit. But in any case where it's not part of the colloquy, this specific part, won't a defendant be able to come back and say, I got more than I expected? In the guilty plea context, of course, that doesn't work because you've been warned. Right. And in all the cases the government cites, there's been a warning. So how are district judges going to handle that situation? I think most of them, if we rule the way you want, will incorporate that as part of the colloquy when doing admissions to supervise release violations. And perhaps that's a good thing. I mean, that's what I think the Seventh Circuit said in their case dealing with a similar issue. That's a good thing. I'm not arguing that it would be required in every single case. But here, where the court knew that it was set for a contested hearing, and, you know, the court in its candor says on pages 20 and 25 of the record, look, I have a sense now that you thought, you know, you were getting six months and you shouldn't rely on that. And that's why he brings up the withdrawal thing. It comes from the court. So I think that not in every case, but here something more was required. And I don't think we need to put our finger on one specific thing, but we can say kind of, as Judge Wardlaw was getting to the point, this is just not fair in this context, in this specific case. But I do think that some standard should come from this court for the future odd times that this doesn't work. Perhaps. In this, you know, under the established case law in Grave and Kennell, this Court is clear. We look to the record to see that there's been an affirmative advisement. The defendant never has the burden of proving the negative that I was not told. I'd like to reserve the balance of 12 seconds. Thank you, Your Honor. May it please the Court. Daniel Zip on behalf of the United States. Your Honors, there's remarkably few issues in this case that are actually in dispute. Both parties agree that the district court had the inherent authority under Rule 57 to allow this defendant to withdraw his admissions. Both parties argued and agree that the fair and just standard from the analogous Rule 11 standard seems to make sense in this case as well. And both parties agree that the defendant's reason for attempting to withdraw his admissions in this case was that he was unhappy with the writing on the wall as to where the sentencing was. What about the threshold problem that the district court didn't identify the fair and just standard, and thus under the Hinkson and other cases, isn't that per se grounds for reversal? I don't think that's what Hinkson said. In Hinkson and the other cases cited by the defense counsel, the issue was whether the district court, in each of those cases, the district court applied the wrong legal standard. It's kind of an odd argument. Well, it's got a lot of language in there that the failure to identify the standard is itself a problem. Because the reviewing court can have no way of assessing the exercise of discretion without knowing what standard was being applied. This seems to be a unique case. And defense concedes and the United States agrees that the Ninth Circuit has never addressed what the appropriate standard was. So it seems difficult to tell the district court there is no standard and it's abuse of discretion not to have that standard. The district court has to identify a standard. On review, this court could say that's the wrong standard, or it could say that's the right standard, but at least there would be an identified standard. So the Hinkson problem would be taken care of. Well, in response to that, I would say that both parties in their briefing to the district court applied this fair and just standard and addressed the issues in that context. Well, the government's brief was a little, I don't know, one toe in the water kind of thing. It wasn't a full embrace of fair and just, at least as I read it. Fair and just reason for withdrawal in this case. That's correct. But all of the discussion was in the context of that fair and just. And I think under Cardi, the court has instructed that we're not to basically assume that the district court was applying a wrong standard just because it didn't say anything. And in this court, in this case, the district court had before it all the discretion and absolute immediate abuse of discretion for him not to have affirmatively announced it. And the other thing that troubled me about your brief is that you said, oh, this, you know, just because you don't like the sentence you're getting doesn't mean you can withdraw your admissions. And all the cases you cite are cases where there's been a Rule 11 plea colloquy, and both of those cases are cases where there's been a rule 11 plea colloquy, and both of those cases are cases where there's been a rule 11 plea colloquy, and both of those cases are cases where there's been a rule 11 plea colloquy. And part of that is a statutory admonition that the judge does not have to apply the sentence that the parties agree to, and that the sentence that you may get may be higher or lower than what you think you're getting based on the recommendations of probation office or your counsel or the prosecutor. Do you understand that? Do you still want to waive your rights? Those are those cases. And it was pretty clear that everybody, including the judge, knew that the sentence was supposed to be six months. It had been agreed to be six months. And then after the admissions, then the judge says, well, I'm going to change that sentence. So he relied on that, and it wasn't until after the admissions were entered. So I kind of come at this case in two ways. One is both the way that we've been discussing it up to this point, but I also wonder whether his admissions were truly voluntary and knowledgeable, and whether he fully understood what the consequences of his admissions were, given that everybody recognized the assumption of six months. And I think that there's a lot of truth to this case, and I think because we're talking about it in the Rule 11 context, it has been presented as if there was some sort of actual agreement amongst the parties, written or otherwise. If you look at what actually happened in this case, and I was the prosecutor that handled it, there was no actual quid pro quo agreement between the defendant, the probation officer, or the prosecution. There wasn't a plea agreement. But there was an understanding, and that's what the probation, well, didn't you understand he was going to get six months? Your Honor, what was the prosecutor's understanding at the time? Our only position was, what occurred and what's written in the factual basis is that immediately before sentencing, unprompted, the prosecutor said, fine, we'll defer to your recommendation, and then he went forward. So you agreed to six months before he pled, the probation office and the prosecutor, and so that was the understanding on which he went forward and pled. So that, to me, would make the admissions suspect, because I understand that in this particular case, maybe all of this is a hullabaloo, because you can still prove the two violations, and you would still prove the two violations, but the admission suspect not being truly knowing and voluntary in this case. Also, it does bother me, too, that there's two violations for the same act, and I know that's kind of inherent in what the standard conditions are, but it does raise his time, and that's why it ended up being at 12 months. Well, I would respond to that and say, Your Honor, the defense, he's argued that his admissions were not knowing and voluntary, because he was guaranteed a six-month sentence, and that simply wasn't the case. That's not what happened in this case. I believe it's guaranteed that he made the admissions on the assumption that, in reasonable reliance, that. Well, I don't think that that's what his argument was. If you look at the argument that he made, it was that he was saying that his argument was that, I don't know where that guarantee or where even that assumption would come from. All that happened in this case is that the probation officer changed his recommendation, and the United States, who is generally not terribly involved in these cases, because it primarily comes at the tail end of the sentencing process, when it's mostly an issue between the district court and the probation and the defendant, the United States said one word and went in for the second word, and that was that the probation officer was simply reducing his recommendation. But didn't the Seventh Circuit in the LeBlanc case suggested, or even stated, that it's not going to be knowing, intelligent, and voluntary if you're not aware of the maximum possible sentence? Well, Your Honor, that might be the case in the Seventh Circuit, but in the Ninth Circuit, in Siegel, this Court has held explicitly that the Rule 11 colloquially, including the recommendation of what the maximum sentence is, is not required. Sure, not the whole colloquy, nor did the Seventh Circuit suggest that, but the specific issue of the maximum available time is a prerequisite to finding that it was knowing, intelligent, and voluntary. Again, that may be what the Seventh Circuit held, but what... Why does that rule not make sense? Because you want to make sure, before someone admits that they haven't gotten, bad advice, misunderstood, and it's just a way to ensure that the person understands, before you do this and take this step, know that you could get whatever it is, 18 months, 2 years, 3 years, whatever it may be in the particular case. That's how the whole Rule 11 thing developed in the first place, and this seems remarkably similar when you're focused on the defendant. Rule 32, as it exists now, outlines what it is that the district court needs to advise the defendant, and that is not currently included in Rule 32. It might make sense to amend that and to add that to Rule 32, but on the facts of this case, it can't have been an abuse of the discretion for this district court not to do something that he wasn't required to do. Thank you. Any other questions? No. Thank you. Thank you, counsel. This case we submitted, and the court will be in a 10-minute recess before we take up the next case. Counsel, be prepared to start the next case as soon as we come back. Thank you.
judges: Kavanaugh, Fletcher B. , Wardlaw